**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| EDITH ALFARO, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-1541 |
| | § | |
| CITY OF HOUSTON and ABRAHAM | § | |
| JOSEPH, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Abraham Joseph, a City of Houston Police Department officer, was convicted of aggravated sexual assault by a public servant and sentenced to life in prison. Four of his victims sued both Joseph and the City. The plaintiffs' Third Amended Complaint alleged that the City is liable under 42 U.S.C. § 1983 for unconstitutional policies and practices in hiring, training, and supervising police officers. The plaintiffs also asserted Texas state law claims for negligence and gross negligence in hiring, training, and supervising officers. (Docket Entry No. 30). Default judgment has been entered against Joseph. The City has moved for summary judgment that, as a matter of law, the plaintiffs cannot meet the requirements for municipal liability under § 1983. (Docket Entry No. 55). The plaintiffs responded to the City's summary judgment motion, the City replied, and the plaintiffs surreplied. (Docket Entries No. 65, 74, 75). The City also moved to strike the report and exclude the testimony of Janet K. Wagner, one of the plaintiffs' designated expert witnesses, and the plaintiffs responded to that motion. (Docket Entries No. 57, 66).

The crimes Joseph committed against Ms. Alfaro, the three other plaintiffs, and perhaps other women, are heinous. They are obviously made worse by the fact that Joseph used his power as a

police officer to rape women who were particularly vulnerable.  The facts that the City hired Joseph and that his crimes went undetected for so long provoke anger.  The plaintiffs and the public deserve the City's answers to the questions this lawsuit raises, such as how this was allowed to happen and whether there are ways to make it less likely.  But the answer to the legal question of whether the City is liable to the plaintiffs for unconstitutional conduct cannot be driven by anger, however justifiable.  Under the law established by the United States Supreme Court and the Fifth Circuit, the answer to the legal question is that the City is not liable to pay damages to the plaintiffs for federal constitutional violations.

Based on the pleadings, the summary judgment record evidence, the motions and responses, and the relevant law, this court concludes that under the prevailing law, based on the undisputed facts, the plaintiffs cannot recover against the City on their federal constitutional claims.  The City's motion for summary judgment on those claims is granted and those claims are dismissed with prejudice.  The motion to strike Wagner's testimony is granted, although that ruling does not affect the outcome.  The state-law negligence claims against the City were previously dismissed.  (Docket Entry No. 41).  Because all claims are resolved, final judgment is entered by separate order.

The reasons for the rulings on the City's summary judgment motion and motion to strike are explained below.

## I.     Background

### A.     The Parties' Arguments and the Summary Judgment Evidence

The plaintiffs' summary judgment evidence includes information about sexual misconduct complaints against police officers, offered to show a pattern of sexual misconduct among the City's police officers to support the inference that the City was deliberately indifferent to the risk of

forcible rape by officers.[1]   The plaintiffs summarize their argument for the City's liability under

§ 1983, as follows:

> The sum of Plaintiffs' argument is this: (1) There is a very distinct pattern of HPD officers sexually exploiting female residents that pre-date the Plaintiffs' rape; (2) the City of Houston uses psychological instruments to [screen] recruits with full knowledge of those tools' limits; (3) the City of Houston admits to knowing the many issues Joseph's application brought and (4) Notwithstanding the aforementioned, the City made a conscious decision to authorize Joseph's hire, who soon thereafter accosted and raped the plaintiffs.

(Docket Entry No. 65, at 13 (emphasis omitted)).   The plaintiffs argue that the City's policies for

screening applicants seeking to serve on the police force are inadequate.   The challenged screening

---

[1]  The plaintiffs' summary judgment evidence includes the following:

| | |
|---|---|
| Exhibit A | Original Complaint of a woman allegedly raped by an HPD officer |
| Exhibit B | City of Houston Investigation Summary for the incident in Exhibit A |
| Exhibit C | Original Complaint of a woman allegedly raped by an HPD officer |
| Exhibit D | City of Houston Investigation Summary for the incident in Exhibit C |
| Exhibit E | Original Complaint of a woman allegedly raped by an HPD officer |
| Exhibit F | City of Houston Investigation Summary for the incident in Exhibit E |
| Exhibit G | City of Houston Documents — Complaints Involving Sexual Misconduct |
| Exhibit H | City of Houston Investigation Summary for an alleged incident of sexual impropriety by an HPD officer |
| Exhibit I | Confidential City of Houston Documents — 2012 Complaint of Sexual Assault |
| Exhibit J | Deposition Excerpts of Dr. Steven Tate, the HPD Staff Psychologist who declared Joseph psychologically qualified to perform the duties of a police officer |
| Exhibit K | Confidential Records of City of Houston — HR Investigation Report |
| Exhibit L | Confidential Records of City of Houston — Psychological Declaration |
| Exhibit M | Deposition Excerpts of Ramiro Montoya, the HPD quality control officer who oversaw the interpretation of Joseph polygraph exams |
| Exhibit N | Deposition Excerpts of Patrick Robinson, the HPD officer who administered Joseph's polygraph exams |
| Exhibit O | Deposition Excerpts of Brett Hatton, the HPD officer responsible for conducting Joseph's preemployment background investigation |
| Exhibit P | Deposition Excerpts of Officer Michael Dirden, Executive Assistant Chief of Police |
| Exhibit Q | Case law |
| Exhibit R | City of Houston General Order |

(Docket Entries No. 69–73).   Although these exhibits are docketed as entries 69 through 73, the briefing refers to them as exhibits to Docket Entry No. 65, the plaintiffs' response to the City's motion for summary judgment.   For simplicity's sake, this court will also refer to these materials as exhibits to Docket Entry No. 65.

3

policies are performing background and prior-employment-history checks, administering candidates certain psychological tests — the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and the Inwald Personality Inventory ("IPI") — and a polygraph examination, followed by a clinical interview with a staff psychologist.

The City responds that the evidence of prior complaints does not show a pattern or practice raising a fact dispute as to municipal liability for failing adequately to screen, train, or supervise. The City contends that there is no basis to conclude that its use of background checks, psychological tests, polygraph tests, and an interview by a staff psychologist was deficient or that it was a causal factor in Joseph's sexual assaults. The City argues that the evidence cannot support an inference that it was deliberately indifferent to the risk of its police officers in general, or Joseph in particular, using the power of their positions to commit rape. The City submits extensive summary judgment evidence of its screening and training of officers in general and of Joseph in particular.[2]

### B.    The Underlying Events

---

[2]  The City of Houston's summary judgment evidence includes the following:

| Exhibit A | Business records affidavit of Wanda O'Bryant attaching under seal as Exhibit A-1: |
| | 1. Abraham Joseph's Employee Complaint History; |
| | 2. Employee Resume; and |
| | 3. Recruitment Correspondence and Investigation Report |
| Exhibit B | Expert report and affidavit of Executive Assistant Chief of Police Dirden |
| Exhibit C | Expert report and affidavit of Janet Olivia |
| Exhibit D | Expert report and affidavit of Dr. Verdi Lethermon |
| Exhibit E | Deposition Excerpts of Officer Hatton |
| Exhibit F | Deposition Excerpts of Sgt. Joseph Frazier, Joseph's patrol sergeant |
| Exhibit G | Deposition Excerpts of Executive Assistant Chief of Police Dirden |
| Exhibit H | Deposition Excerpts of Jane Doe One |
| Exhibit I | Deposition Excerpts of Jane Doe Two |
| Exhibit J | Deposition Excerpts of Jane Doe Three |
| Exhibit K | Deposition Excerpts of Edith Alfaro |
| Exhibit L | Plaintiffs' Admissions and Alfaro's Interrogatory No. 9 Answer |

(Docket Entry No. 55).

The facts of the crimes Joseph committed are not materially in dispute.  Joseph forcibly raped Ms. Alfaro and Does One, Two, and Three between October 2010 and January 2011.  The plaintiffs are all Hispanic women.  Joseph was on duty, wearing his uniform, and driving his patrol car.  He stopped the women without a legal basis for doing so and assaulted them.  He handcuffed Ms. Alfaro while she was standing outside the place she worked, on a break, and raped her repeatedly.

Ms. Alfaro filed a complaint against Joseph with the HPD on January 2, 2011, after she was raped.  (Docket Entry No. 55, Ex. B, at 6).  Joseph was relieved of duty the same day and a warrant was obtained to extract DNA evidence from him.  (*Id.*).  Does One, Two, and Three did not report Joseph at the time they were raped.  (Docket Entry No. 55, Ex. H, at 30; Ex. I, at 26–28; Ex. J, at 39).  They did speak with HPD or the City after January 2, 2011, when they were contacted by investigators during the investigation begun by Ms. Alfaro's complaint.

Joseph was convicted in October 2012 of aggravated sexual assault by a public servant.  He was sentenced to life in prison for raping Ms. Alfaro.

C.      **The City's Screening, Training, and Supervision**

   1.     *The Tests and Checks for Screening Applicants*

The City's process for evaluating and hiring applicants for police officers in January 2009, when Joseph was hired as a police trainee, included a background check, investigation, and fitness evaluation conducted under Texas law and the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE).  (Docket Entry No. 55, Ex. A-1).  Minimum requirements for screening police-officer applicants are established by Chapter 143 of the Texas Local Government Code and TCLEOSE standards.  These requirements and standards include psychological and medical clearance, completion of an extensive application form, and a

background check into former places of employment and residence.

According to HPD's Executive Assistant Chief of Police Michael Dirden, the background check includes talking to the applicant's former employers and neighbors, "to see if, at the very least, an applicant would be welcome back or if the involved employers or residence managers had favorable recommendations for the applicant." (Docket Entry No. 55, Ex. B, at 3). The psychological component of the preemployment screening consists of two tests — the MMPI-2 and the IPI, a clinical interview, and a polygraph examination. According to HPD Staff Psychologist Dr. Steven Tate, the MMPI-2 contains 567 questions. (Docket Entry No. 65, Ex. J, at 77). The IPI contains 310 questions. (*Id.* at 78). Both tests use scales to measure and report a range of what is considered normal to what is considered abnormal behavior. (*Id.* at 77–78). Psychologists use the MMPI-2 and IPI to inform their clinical opinions. (*Id.* at 46). The tests are not meant to determine whether a candidate has tendencies toward rape. (*Id.* at 36). Rather, they test the candidate's psychological pathology. (Docket Entry No. 55, Ex. D, at 2). The tests are "two of the most widely used" psychological tests in the assessment of law-enforcement personnel. (*Id.*). The polygraph test yields one of four outcomes: "no deception indicated"; "deception indicated"; "inconclusive"; or "no opinion." (Docket Entry No. 65, Ex. M, at 29). "Inconclusive" indicates that the candidate was unable to demonstrate whether he was being truthful. (*Id.*). "No opinion" indicates that the examiner could not give an opinion for any number of reasons, including health issues during the test or interruptions. (*Id.*). After the examiner completes the polygraph test, quality control personnel review the test and independently score the results. (Docket Entry No. 65, Ex. N, at 43).

The psychological and polygraph test results, and the results of the background check, are provided to a staff clinical psychologist, who interviews the candidate. (Docket Entry No. 65, Ex.

6

J, at 46).  The psychologist uses the information provided to determine if there are any concerns with the candidate's psychological fitness to perform as a police officer.  (*Id.* at 45–46).  The interview typically lasts 30 minutes to an hour.  (*Id.* at 46).  The psychologist ultimately decides whether a candidate passes.  (*Id.* at 45–46).

Some of Joseph's scores on the two polygraph tests were "inconclusive."  On the first test, administered on October 10, 2008, Joseph was rated "inconclusive" on his response to the following question:  "While employed in any area of Public Safety, did you ever do anything for which you could have been fired?" (Docket Entry No. 65, Ex M, at 38).  The quality control officer reviewing the examiner's evaluation agreed that the response to this question was "inconclusive."  (*Id.* at 39). Joseph scored "inconclusive" on a second polygraph test administered on November 17, 2008.  (*Id.* at 63).  He gave "inconclusive" answers on several questions, including: "Are you intentionally withholding any information about your involvement with illegal drugs?"; and "Have you ever committed any serious crime?" (*Id.* at 38–39).  The quality control officer noted "Possibility of C/M [i.e., countermeasure]?" on the form, (Docket Entry No. 65, Ex. 2 to Ex. N), indicating a suspicion that the examinee had tried to "beat" the polygraph on these questions, (Docket Entry No. 65, Ex. M, at 41).

The process for hiring Joseph in January 2009 included a background check. The criminal-record check showed only traffic violations.  HPD investigated Joseph's family, neighborhood, and employment experiences.  This investigation included interviews conducted in New York, where Joseph had lived and worked for the New York Police Department.  Brett Hatton, the Houston Police Department officer assigned to conduct the background investigation of Joseph, traveled to New York and interviewed Joseph's former neighbors, employer, and references.  The neighbors

reported nothing out of the ordinary. (Docket Entry No. 55, Ex. E, at 51–52). The New York Police Department provided no negative information and verified Joseph's prior employment. The investigator did not learn whether Joseph had been the subject of discipline or internal affairs investigation while a New York City police officer, or why he had left. Joseph had provided references, including other former employers and several New York City police officers. The investigator called Joseph's references. (Docket Entry No. 55, Ex. A-1, at 15–16). The report of the conversations with the references noted that the recommendations were favorable. (*Id.* at 12–16; Docket Entry No. 65, Ex. O, at 28).

After the psychological tests and the polygraph test were administered and the background checks concluded, Joseph was interviewed by Dr. Steven Tate, a clinical psychologist on HPD's staff. (Docket Entry No. 65, Ex. J, at 25, 46). Dr. Tate testified that the 30 to 60 minute interview would have covered:

> [q]uestions that pertain to issues that relate to [Joseph's] psychological and mental health; whether or not there's any concerns that were raised from the testing that was done or background information . . . obtained from HPD recruiting; [Joseph's] history as a child, patterns that may be of concern that were raised during that time; anything that is potentially psychopathological.

(*Id.* at 28). Dr. Tate also testified that the psychological tests were "just instruments" and that the "main focus" of the interview "is our ability to determine concerns that may be raised with that individual in seeing our office." (*Id.* at 46). Dr. Tate used "every . . . piece of information that [HPD had] on that individual, which includes these tests," to make a psychological fitness determination. (*Id.*).

The evidence is undisputed that the tests the City used are the most common screening tests for police-officer hiring in the country. The evidence is undisputed that the background checks used

are standard.  It is undisputed that other than the "inconclusive" responses to some of the questions on some of the polygraph test questions, Joseph's results were unexceptional.  There was no information in his background check, including the check into his prior work as a New York City police officer, that indicated prior sexual assaults or a likelihood that he would commit them in the future.  The plaintiffs claim that the fact that before and after Joseph was hired, there were complaints of sexual assaults against HPD officers, shows that the City used tests and investigations that were deficient at identifying likely sexual predators and that the City was aware of the deficiency.

2.    *Training*

The training HPD gave cadets in 2009 "me[t] or exceed[ed] the training requirements set out by TCLEOSE" and included instruction "in laws of arrest, search, seizure, the Texas Code of Criminal Procedure, the Texas Penal Code, and the U.S. Constitution."  (Docket Entry No. 55, Ex. B, at 3).  Following that training, the Field Training Program matched probationary officers with experienced field training officers, who evaluated whether the probationary officer could apply what he learned in the training.  (*Id.*).  The program gave probationary officers immediate feedback and daily critique.  (*Id.*).  The Field Training Program lasted four to six months.  Those who did not successfully complete the program did not become HPD officers.  (*Id*. at 3–4).

The HPD provides ongoing training for officers who pass probationary status.  (*Id.* at 4).  HPD policy required twice the amount of ongoing training set by TCLEOSE.  (*Id.*).  This training included mandatory sessions discussing sexual offenses and misconduct by police officers.  (*Id.*).  Joseph went through the training and passed it successfully.  He took and passed the decisionmaking course that included lectures and training on the legal, moral, and personal consequences for an

9

officer who engaged in on-duty sexual misconduct.  (Docket Entry No. 55, Ex. G, at 100–01).

###### 3.    Supervision

HPD's supervision of its officers includes different steps. Officers receive formal performance evaluations twice a year.  (Docket Entry No. 55, Ex. B, at 4).  Allegations of misconduct are investigated by HPD's Internal Affairs Division.  (*Id.*).

Joseph was assigned to Sgt. Joseph Frazier, who supervised between 7 to 9 officers.  Frazier testified that he did not receive any formal complaints against Joseph about any subject and did not receive any formal or informal complaints about Joseph committing sexual misconduct.  Frazier recalled that a woman had complained informally that Joseph had been rude to her.  Joseph called Frazier to come to the scene when the woman asked for a supervisor.  The woman complained that when Joseph told her that he could not do anything to respond to her reason for calling the police — her ex-husband had let a girl come into his garage to look for a cat — he was rude and condescending.  Frazier had Joseph apologize.  (Docket Entry No. 55, Ex. F, at 28, 30, 32, 95–96, 98, 103–05).  Frazier otherwise had no problems supervising Joseph.  (*Id.* at 95–96).

###### 4.    HPD's Written Policies

Officers are provided several Rules and General Orders, with updates, that govern officer conduct.  (Docket Entry No. 55, Ex. B, at 4).  General Order 100-06, *Department Mission, Values, and Guiding Principles*, instructs officers to engage in behavior that is "beyond ethical reproach and reflects the integrity of police professionals."  (*Id.* at 5).  General Order 500-20, *Treatment of Prisoners, Suspects and Other Citizens*, instructs officers to "treat all prisoners, suspects, and citizens in a humane and lawful manner."  (*Id.*).  General Order 500-01, *Effecting Arrests and Searches*, instructs officers that "[t]he highest regard possible will be given to arrested individuals'

and officers' safety and well-being." (*Id.*).  General Order 500-02, *Handling and Transporting Prisoners*, instructs officers that they "will treat all persons with respect and dignity." (*Id.*).  General Order 200-08, *Conduct and Authority*, instructs officers to use "[r]easonableness and sound judgment" in their actions and to abide by the laws of the jurisdiction they are in. (*Id.* at 5–6).

### D.      The Evidence of Prior Reports of Officers' Sexual Misconduct

Between February 2005 and January 2011, the City received at least 50 complaints of sexual misconduct against HPD officers. (Docket Entry No. 65, Ex. G).  Every claim was investigated. (*Id.*).  The City provided a printout of these instances from its investigation records, and the plaintiffs filed the compilation under seal in its summary judgment record as Exhibit G.  Of the complaints in Exhibit G, approximately 35 involved incidents that happened before the City hired Joseph.  Nearly 20 of those incidents could be fairly described as forcible sexual assault by a police officer.  Eight of those complaints were sustained, in whole or in part, and are described in the City's records as follows:

| | |
|---|---|
| April 3, 2005 | A 17-year-old female alleged inappropriate sexual contact |
| July 28, 2006 | A complainant alleged she was sexually assaulted by a police officer |
| May 17, 2007 | Sexual assault |
| October 27, 2007 | A complainant alleged that a vice officer sexually assaulted her at a hotel |
| June 2, 2008 | Sexual assault |
| September 6, 2008 | Sexual assault |
| January 10, 2009 | A complainant in a robbery case alleged that the investigating officer sexually assaulted her |

January 30, 2009     "Sexual assault delayed report"[3]

(*Id.*).   The information about these incidents in the City's internal-affairs report is limited essentially to what is shown above.   The plaintiffs provided additional detail about some of the complaints from civil suits filed against the City by some of the complainants.

On July 28, 2006, HPD Officer William Archer saw the complainant driving alone.   He turned on his police sirens and ordered her to park at a secluded location.   (Docket Entry No. 65, Ex. A, ¶ 3.1).   Archer ordered the complainant into the back of his squad car, where he drove her to another remote location and forced her to perform oral sex on him.   (*Id.*, ¶¶ 3.1–3.2).   The complainant reported this crime to HPD's Internal Affairs Division.   (*Id.*, ¶ 3.3).   The Internal Affairs Division issued an internal memorandum dated September 27, 2006 sustaining a finding of "improper sexual activity with person in custody" by Archer.   (Docket Entry No. 65, Ex. B, at 3).

On May 17, 2007, HPD Officer Eric Dargin saw the complainant driving alone.   He turned on his police sirens and pulled her over at a dark Houston location.   (Docket Entry No. 65, Ex. C, ¶ 3.1).   Dargin then sexually assaulted the complainant by fondling and licking her breasts and vagina.   (*Id.*, ¶¶ 3.3–3.4).   The complainant reported the criminal act to HPD's Internal Affairs Division.   (*Id.*, ¶¶ 3.6).   An Internal Affairs officer told her that "they have been waiting to catch [Dargin] for a long time."   (*Id.*).   The Internal Affairs Division issued an internal memorandum dated July 16, 2007 concluding that "[b]ased on the findings of this investigation, there is sufficient evidence to prove that Officer E.M. Dargin engaged in sexual assault."   (Docket Entry No. 65, Ex. D, at 3).

---

[3] It is unclear from the record whether this phrase means that the officer or the victim delayed reporting sexual assault.

In the early hours of June 2, 2008, HPD Officer James Rodriguez encountered the complainant after a night of partying.  (Docket Entry No. 65, Ex. H, at 1).  The complainant remembered a male police officer saying, "You're not going to say anything, right?," and woke up that morning with a discharge on her underwear as if she had had sexual intercourse.  (*Id.*).  Others who saw the complainant that night told her that they believed she had been arrested for public intoxication and that they had found her lying asleep in the back seat of a patrol car.  (*Id.*)  The complainant reported a criminal act to HPD the next day.  (*Id.* at 1–2).  The investigation revealed that Officer Rodriguez drove the complainant to a secluded area and was not in contact with the dispatcher from approximately 2:00 a.m. to 2:10 a.m.  (*Id.* at 5).  Investigators administered a polygraph test and concluded that Officer Rodriguez was not being truthful about the incident.  (*Id.*).

On September 6, 2008, Officer Rodriguez encountered the complainant after she was involved in a motor vehicle accident.  (Docket Entry No. 65, Ex. E, ¶ 8).  The complainant had a warrant for an unpaid traffic ticket.  (*Id.*, ¶ 10).  Officer Rodriguez handcuffed the complainant and began transporting her to jail.  (*Id.*, ¶¶ 11–13).  Rodriguez stopped at a poorly lit area and "sexually assaulted [the complainant] without her consent as she cried."  (*Id.*, ¶¶ 13–18).  The complainant reported the incident to the Internal Affairs Division.  She learned during the investigation that Officer Rodriguez had been the subject of another complaint involving sexual misconduct.  (*Id.*, ¶¶ 21–22).  On January 27, 2009, the Internal Affairs Division concluded that there was sufficient evidence to prove that Officer Rodriguez committed sexual assault, including evidence from Rodriguez's squad car's vehicle location system that placed Rodriguez in the secluded area the complainant alleged she was raped.  (Docket Entry No. 65, Ex. F, at 5).

The plaintiffs state that these incidents are only "some of the disturbing sexual assault claims

13

that we know of" because these are only "some of the sexual assault claims reported." (Docket Entry No. 65, at 6 (emphasis omitted)).  Executive Assistant Chief of Police Dirden testified that some people do not file complaints, for various reasons: "some of them fe[ar] repercussion; some may feel that the police department is not gonna do nothing about it; some may engage or have been engaged in illegal conduct at the time and think that it may impact negatively on them." (Docket Entry No. 65, Ex. P, at 117).  The City's awareness that the reported instances of police-officer sexual misconduct understates the frequency is undisputed.  There is no evidence as to what the number of unreported instances might be.

## II.    The Motion for Summary Judgment and Motion to Strike

### A.    The Parties' Summary Judgment Arguments

The City argues that it is entitled to summary judgment because the plaintiffs have neither identified nor presented sufficient evidence of a constitutionally deficient policy, practice, or custom in hiring, training, or supervising police officers, or investigating or responding to sexual-assault complaints against police officers.  The City argues that there was no evidence of constitutional deficiency in how the City hired Joseph or in the training and supervision he received that is linked to the rapes he committed.  The City argues that the results of its screening, training, and supervision do not provide any basis to infer that the City was deliberately indifferent to a risk that Joseph was a sexual predator.  Nor was there evidence that the City had approved of or ratified Officer Joseph's misconduct.  The City also argues that there is no basis to conclude that it was on notice of a deficiency in its screening and supervision of police officers based on a pattern of prior sexual assaults by officers.  (Docket Entry No. 55, at 15–24).

The plaintiffs respond that "the City knew well before then-active duty HPD officer

14

Abraham Joseph raped the first plaintiff herein that there was a troubling pattern of sexual abuse claims involving its police officers toward female residents."  (Docket Entry No. 65, at 2).  The plaintiffs describe the summary judgment evidence showing 20 incidents involving sexual assault claims by other complainants and other on-duty HPD officers.  "All of the sexual offenders went through the police selection process and [were] declared *qualified* to serve as police officers by the City using the same defective assessment proficiencies."  (*Id.* at 6 (emphasis in original)).  The plaintiffs argue that the City's preemployment screening practices — using the psychological evaluations, polygraph tests, and background checks — were so inadequate to identify and screen out officers like Joseph that the City was deliberately indifferent to the known or obvious consequence that its continued use of such practices would result in constitutional violations.  (*Id.* at 14).  "[T]he issue before this Court should be either: (1) whether the City can continue to rely on its oft-cited defense that its officers are aware of what will happen to them after the commission of such heinous assaults or (2) whether the City had reason to know that more was required at the initial hiring stages to carry out its affirmative duty to protect its citizens from even its own in light of the widespread and pervasive history of sexual assaults."  (*Id.* at 20–21 (emphasis omitted)).  The plaintiffs argue that the latter is true.

The City responds that the plaintiffs have not presented argument or evidence in support of their claims of inadequate supervision or training.  The plaintiffs' response to the summary judgment motion focused on the theory that there was a pattern of sexual misconduct among the City's officers, and that in light of this alleged pattern, the City was aware that its prehire screening process was constitutionally inadequate.  (Docket Entry No. 74, at 2 (citing Docket Entry No. 65, at 13)).  Supervision and training were not discussed.  The City argues that the list of prior assaults by

15

officers cannot show a pattern or practice, and that the evidence in the record cannot show a causal link between the alleged deficiencies in the hiring process and Joseph's illegal acts. (*Id.*). In their surreply, the plaintiffs argue that the cited previous incidents of sexual assaults involving officers were sufficiently numerous and similar to Joseph's assaults on them as to give rise to a genuine fact dispute about the City's deliberate indifference to the inadequacy of its screening and hiring policies. (Docket Entry No. 75).

<h3 style="text-align:center">B.      The Expert Testimony and the Motion to Strike[4]</h3>

In support of their opposition to the City's motion for summary judgment, the plaintiffs designated Janet K. Wagner as a witness under Rule 702 of the Federal Rules of Evidence and submitted her report, "The City of Houston: A Pioneer in the Protection of Women." (Docket Entry No. 48, Ex. 4). Wagner is designated as an expert to testify "[o]n the issue of the widespread and reported instances of sexual assaults by police officers in and surrounding the Houston Police Department and the City of Houston's apparent knowledge of this pattern of sexual misconduct . . . ." (Docket Entry No. 47, at 3).

Wagner is a landscape architect. She holds a B.S. from Texas A&M University. (Docket Entry No. 48, Ex. 4, at 8). Her company, J. K. Wagner & Co., "has conducted historic land use research and site analysis projects in thirty-five states . . . ." (*Id.*). She has given expert testimony primarily on historic land use. (*Id.* at 13–14). Wagner's report includes a partial list of past cases she has worked on. None of the cases listed describe her as being identified as having any expert

---

[4] This portion of the factual background refers to the motion to strike Janet K. Wagner's expert testimony and report. (Docket Entry No. 57). The City also objected to the expert report of Daniel C. Claiborn, (Docket Entry No. 51), on the ground that it was not sworn or verified, (Docket Entry No. 74, at 1). This objection is overruled as moot in light of the grant of summary judgment for the City. It is also moot because the plaintiffs submitted an affidavit by Dr. Claiborn verifying his expert report. (Docket Entry No. 75, Ex. 1).

knowledge about adequate steps to screen police officer applicants to identify those likely to use their office to commit rape.  (*See id.*).

Wagner's report briefly describes the City's policies of protecting women from sexual harassment and assault, both by the police and by others.  (*Id.* at 2–3).  Her report begins with the City's efforts at the start of the 20th Century to regulate "personal conduct" in an effort to "set the guidelines for peace, tranquility and allowing positive development and improvements of the lands and business" in Houston.  (*Id.* at 1).  She cites an early ordinance stating that "it shall be unlawful for any person to conduct or carry on any boisterous or insulting language, or be guilty of any disorderly, lewd or lascivious conduct of any kind in any park."  (*Id.* at 1–2 (quotation omitted)). The City later enacted ordinances that prohibited rudeness, profanity, and making "goo goo eyes" at women.  (*Id.* at 2 (quoting City of Houston Ordinances, § 842 (1905))).  A 1968 ordinance prohibited "molest[ing] or accost[ing] a female person in a public place by the use of indecent remarks or by rude behavior."  (*Id.* at 3 (quotation omitted)).  Wagner notes Houston's successful elimination of its red-light district by 1915.  (*Id.* at 3–5).  She briefly summarizes HPD's officer-conduct policies and its recruiting, screening, and training policies.  (*Id.* at 5–6).  The policies included the 1970 implementation of TCLEOSE standards and the first psychological screening of recruits in 1978.  Wagner then summarizes her opinion, as follows:

> For the past eight years, since 2004, numerous monthly articles appear in the news and on websites discussing inappropriate sexual activity or behavior of Houston Policemen toward women in the community.  In nearly each instance, the Police officer was using his uniform of authority to promote his ability to advance improper sexual activity upon females.
>
> A news story came out on October 6, 2007 that accusations resulted against some Police Department employees regarding cheating on an open-book proficiency test. Whereas Police training employs screening tests, psychological tests and observation by training officers, one wonders where the training allows individuals to slip past

such rigorous testing.

> A hundred years ago, the City of Houston defined respect and security for citizens as well as specifically including ordinances regarding females, police attitudes and police conduct. In the present century, sexual harassment of females, even those under arrest, by Houston Policemen should not be tolerated among appropriately trained police officers.

(*Id.* at 7).

The City moved to strike Wagner's report and exclude her testimony because she was not qualified to offer opinions about screening potential police officers and because the opinions she did offer were neither relevant nor helpful.  (Docket Entry No. 57).  The plaintiffs responded that Wagner was appropriately designated as a historical expert who "possesses the ability to research, chronicle and provide helpful testimony regarding the historical knowledge that was available to the City of Houston's policymakers regarding the sexual abuses by Houston police officers under color of law." (Docket Entry No. 66, at 2).  The plaintiffs do not offer Wagner as an expert on causation. They do offer her as an expert about the City's knowledge of  the risk that officers would sexually abuse persons in custody and "historian proclamations by [the] City of Houston's policymakers showing their stated knowledge of said risk."  (*Id.* at 3).

Rule 702 of the Federal Rules of Evidence states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  As a threshold matter, the trial judge must determine whether the designated

witness is qualified to give the proffered expert opinion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). Witnesses may be qualified as experts if they have specialized knowledge, skill, experience, training, or education. FED. R. EVID. 702(a). The court must determine whether the training or experience is sufficiently related to the issues and evidence so that the testimony will assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562–63 (5th Cir. 2004). The burden is on the party offering the expert testimony to establish admissibility, by a preponderance of the evidence. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

The plaintiffs do not meet that burden as to Wagner's opinion. First, she does not appear qualified to give opinions on evidence and issues that are relevant. She is a landscape architect by training. Her work as a historian has been in the area of land use. She does not have training or experience that qualify her to opine on screening potential employees for law-enforcement positions. The plaintiffs, recognizing this, do not offer her for that purpose. She is designated as an expert to "provide helpful testimony regarding the historical knowledge that was available to the City of Houston's policymakers regarding the sexual abuses by Houston police officers under color of law," and "historian proclamations by [the] City of Houston's policymakers showing their stated knowledge of said risk." (Docket Entry No. 66, at 2–3). But this is either information that does not require an expert or does not bear on disputed matters in this case.

"'The test for determining the appropriateness of expert testimony is "the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."'" *Rosenfeld v. Oceania Cruises, Inc.*, 682

F.3d 1320, 1331 (11th Cir. 2012) (Tjoflat, J., dissenting from the denial of rehearing en banc) (quoting *Pelster v. Ray*, 987 F.2d 514, 526 (8th Cir. 1993); Fᴇᴅ. R. Eᴠɪᴅ. 702, Committee Note); *see also Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984) (per curiam) ("Where the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous."). Matters of common sense typically do not require or allow for expert testimony.

Wagner's opinions are not helpful to understanding the issues that are in dispute. The City does not dispute that some of its police officers have committed rape. The parties do not dispute that the City has long had policies prohibiting sexual misconduct by officers and measures to identify and screen out unfit applicants for police work, including applicants likely to abuse the power of their uniform and office. The need for such policies and measures is also either undisputed or within the common knowledge and experience of jurors. The critical dispute is whether the City's policies were constitutionally defective because the screening process used still results in hiring police officers who go on to commit sexual assaults. Wagner's testimony will simply not help the jury understand the evidence about the efficacy and constitutionality of the City's screening process. *See* Fᴇᴅ. R. Eᴠɪᴅ. 702(a).

Even if this court considered Wagner's testimony, the City would still be entitled to summary judgment. Wagner's testimony does not give rise to a fact dispute about whether the City's hiring policies were so ineffective that their continued use shows deliberate indifference to the clear risk that the City would hire a rapist who would use his authority to commit his crimes. The motion to exclude Wagner's testimony is granted or, alternatively, moot.

## III.    Analysis of the Summary Judgment Motion

### A.    The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.,* 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

21

at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**B.      Analysis**

Although the plaintiffs alleged failure to screen, train, and supervise Joseph, the plaintiffs have opposed summary judgment solely on the ground that the City's police officer hiring procedures were so obviously inadequate that the City was deliberately indifferent to the known risk that the plaintiffs' rights would be violated.

Under § 1983, a city may be held liable only for constitutional violations resulting from an official policy or custom.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  A municipality may not be held vicariously liable for the unconstitutional torts of its employees and is not liable merely for employing a tortfeasor.  *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).  Unconstitutional conduct must be directly attributable to the municipality through official action. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690 n.55 (1978).  "[I]solated unconstitutional actions by municipal employees will almost never trigger liability."  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).  Liability requires a policy maker, an official policy, and a violation of constitutional rights.  The policy or custom must be the "moving force" behind the constitutional violation.  *Monell*, 436 U.S. at 694.  To show an official policy, there must be a written policy or policy statement announced by the policy maker, or a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.) (quotation omitted), *rev'd in part en banc on other grounds*, 739 F.2d 993 (1984).  The plaintiffs must also show that the custom or practice

22

caused the constitutional violation.  *See, e.g.*, *Lewis v. Pugh*, 289 F. App'x 767, 775 (5th Cir. 2008) (per curiam) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)).

The plaintiffs have neither presented nor identified evidence that Joseph's illegal acts of sexual assault were caused by a City of Houston policy or practice.  The City's policies stated the obvious: officers cannot engage in sexual misconduct.  Rape is illegal.  The City's written policies and training made that clear to its police officers.

Courts have rejected similar municipal-liability claims on causation grounds.  *See, e.g.*, *id.* ("The actions of Pugh in raping and assaulting Lewis in March 2005 were entirely caused by Pugh. There is simply no evidence in the record that Pugh made the decision to rape Lewis for any reason related to any City policy or custom or understanding thereof which he may have had, or for any reason other than his own motivations for assaulting Lewis."); *Baker v. Holman*, 2010 WL 3927579, at *5 (N.D. Miss. Oct. 4, 2010) ("[A]s in *Lewis*, there is *no evidence* that any officer, including Officer Holman, thought the Chief or the City of Okolona would condone forcibly raping a citizen or any other form of sexual harassment and/or misconduct." (emphasis in original)); *see also Parrish v. Ball*, 594 F.3d 993, 1000 (8th Cir. 2010) (noting that even if a sheriff's failure to train a deputy on the law concerning sexual assault was deliberate misconduct, causation was "too remote as a matter of law to 'demonstrate the close relationship necessary to conclude that the [county's] failure to properly train [the deputy] *caused* him' to sexually assault Parrish." (emphasis in original)).  Here, the City's policies prohibited Joseph's conduct.  The undisputed evidence shows that Joseph was interviewed, tested, screened, trained, and supervised to prevent such behavior.

The plaintiffs argue that the record raises fact disputes as to whether the City was aware of, and deliberately indifferent to, the risk that its screening was ineffective to identify police-officer

23

applicants who would abuse their office to commit sexual assaults, including rape.   The evidence is inadequate in two respects.   First, the evidence of prior complaints about sexual assaults by officers does not show a pattern that would support the inference that the City was deliberately indifferent to constitutionally deficient screening of police officers or a causal link between the screening and rapes committed by police officers.   Second, the evidence of the testing and screening procedures used does not create an inference of constitutionally deficient screening or a causal link between the screening and police officers' sexual offenses.

As to the first problem, the plaintiffs' list of officers' sexual misconduct complaints is insufficient to raise a triable fact dispute about deliberate indifference.   *See, e.g.*, *Oporto v. City of El Paso*, 2012 WL 2191697, at *5 (W.D. Tex. June 14, 2012) (rejecting as evidence of a pattern 32 purportedly similar incidents of police misconduct over 15 years).   The Fifth Circuit requires more than a list of instances of misconduct to ensure that the jury has the necessary context to glean a pattern, if any.   *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009).   The number of incidents requires the context provided by, for example, the "department's size or the number of its arrests."   *See id.* at 852.   The incidents must also be sufficiently similar to warrant an inference of a pattern.

The plaintiffs rely on the complaints reported to HPD's Internal Affairs Division between 2005 and 2011.   That list includes approximately 50 complaints.   Approximately 35 happened before Joseph was hired.   Approximately 20 of those involved forcible sexual assault by an on-duty officer.   Eight of those complaints were sustained.

Under current case law, the list of relevant incidents in the relative period — approximately 20 sexual assault complaints, 8 of which were sustained, from 2005 to 2009, in the nation's fourth

24

largest city — does not show a pattern or support an inference of deliberate indifference.  *See, e.g.*, *Oporto*, 2012 WL 2191697, at \*5 (finding that the plaintiffs' evidence of 32 alleged incidents of excessive deadly force in 15 years and 104 excessive force complaints in one year did not raise a triable issue of fact on their Fourth Amendment excessive force claim); *Peterson*, 588 F.3d at 852 n.4 ("Twenty-seven incidents in four years, with no context as to the overall number of arrests or any comparisons to other cities[' police departments], is not sufficient evidence of a pattern rising to the level of a policy."); *James v. Harris County*, 508 F. Supp. 2d 535, 544 (S.D. Tex. 2007) (noting that a list of incidents does not create a triable fact dispute without the context of the size and number of arrests of the Harris County Sheriff's Office).  The plaintiffs have not placed the numbers in the context of the size of the City's police department, or identified the similarities between the cited complaints and the plaintiffs' allegations, or identified similarities between the decision to hire the listed officers and Joseph.  The additional information the plaintiffs provide from civil litigation arising from the 8 sustained complaints from 2005 to 2009 does not, under current law, fill in these  evidentiary gaps.

Wagner's opinions about the inefficacy of HPD policy does not provide a basis for an inference of deliberate indifference.  Her proposed testimony about the history of the HPD and the City's knowledge that officer conduct needed regulation does not address the relationship between the City's hiring policies, the number of reported incidents, and factors such as the size of Houston's police force and the overall number of arrests during the same period.

Nor does the summary judgment record show deficiencies in the City's hiring practices, either in general or as to Joseph in particular, that give rise to factual disputes material to determining whether the City is liable under § 1983.  "Only where adequate scrutiny of an

applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Brown*, 520 U.S. at 411; *see also Stokes v. Bullins*, 844 F.2d 269, 275 n.9 (5th Cir. 1988) (stating in dicta that a § 1983 plaintiff would have to "establish actual knowledge of the seriously deficient character of an applicant or a persistent, widespread pattern of the hiring of policemen, for instance, with a background of unjustified violence"). There is no showing of a deficient policy that was maintained "with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (quotations omitted); *see also Oporto*, 2012 WL 2191697, at *5.

The plaintiffs argue essentially that the City's screening policies and practices were ineffective in uncovering officers' psychological propensities for committing sexual assault while in uniform, and that the known or obvious consequence was the violation of the plaintiffs' constitutional rights. First, the background checks. The undisputed evidence shows that HPD investigates applicants' credit history, criminal history, prior employment, past neighbors, and references. HPD did that here. HPD received favorable recommendations from New York City police officers with whom Joseph had worked, verified his employment with the department, and interviewed neighbors in New York. The result was a verification of prior employment, an absence of any criminal history other than traffic violations, and references that checked out. The plaintiffs have identified nothing in Joseph's personal or employment record when he was accepted as a police trainee that would put the City on notice that the plainly obvious consequence of accepting Joseph

26

would be sexual assault. Joseph had no criminal record. No former neighbor, former employer, or reference provided negative information about him. Joseph had no negative employment history with the New York Police Department. In short, no red flags. The plaintiffs have criticized aspects of the HPD background check but have not argued that there was important, specific negative information in Joseph's past that should have come to light that did not.

Could more have been done, such as more thorough digging into Joseph's prior employment with the New York Police Department? More can always be done, but that is not the test for constitutional deficiency. Even negligence is insufficient. And where, as here, there is no indication that additional investigation would have revealed specific information about a history of or clear propensity for misusing the office to commit sexual assaults, there is no inference of a causal link between the background check and the rapes Joseph committed.

Second, as to the psychological tests, there is again an insufficient record to raise an inference that the tests were constitutionally inadequate, that the City was deliberately indifferent to the inadequacy, and that there was a causal link to the sexual assaults on the plaintiffs. Both sides submitted expert testimony about how the tests HPD used compared to those used by other departments and to the standards for law enforcement agencies. The plaintiffs rely on Dr. Daniel Claiborn, who offered the opinion that the City's psychological tests were inadequate because both tests screened for psychopathology rather than measuring the strengths and weaknesses of a subject's normal psychological functioning. (Docket Entry No. 51, at 3). Dr. Claiborn opined that more applicants are psychologically unsuited for police work than exhibit psychopathology, and that tests of normal traits would allow the City to determine unfitness on more than psychopathological grounds alone. The City responded with the expert opinion of HPD's Director of Psychological

27

Services, who explained that HPD's procedure for evaluating applicants consists not only of administering "'two of the most widely used instruments in the industry'" — one of which was developed specifically for evaluation of applicants for law enforcement positions — but also an examination by a licensed psychologist following a clinical interview. (Docket Entry No. 55, Ex. D, at 1–3). The City's psychological testing of applicants meets the TCLEOSE requirements. (*Id.* at 3).

While again there is more that could have been done, there is no testimony or evidence that another combination of tests besides the MMPI-2 and the IPI would be so much more effective in identifying an applicant who is likely to use the office to commit rape as to make it unconstitutional to continue their use. Dr. Claiborn opined that there was an unreasonable risk that a psychologist could miss important information about an applicant's normal-function capabilities if the psychologist performed a psychological evaluation without having administered normal-function testing. (Docket Entry No. 51, at 5).[5] But Dr. Claiborn did not opine about the tests in combination

---

[5] Dr. Claiborn stated that in his "experience and practice, not only are tests of normal traits and cognitive ability necessary to make a full job suitability determination (beyond just tests to detect possible psychopathology), but also (1) tests that are less black-and-white . . . , (2) tests that measure empathy, complexity of analysis, and law enforcement judgment, and (3) tests that require a writing sample, rather than just a true-false format." (Docket Entry No. 51, at 3). Dr. Claiborn qualified that "[s]ince Officer Joseph's screening test results were not available to this expert for review, comment cannot be made about his scores, about his indicated suitability for police work, or about the quality/adequacy of Dr. Tate's original pre-employment conclusion." (*Id.* (emphasis omitted)). Dr. Claiborn opined that "[t]he psychological testing used in this case represents a minimal level of investigation, the psychologist does not appear to have been specifically trained in the psychological evaluation of police officers, and there was no written report provided to detail the candidate's strengths and weaknesses and possible problem areas to address in supervision or training." (*Id.*). Dr. Claiborn's overall opinion on HPD's testing was that "[i]nformation from a candidate's psychological testing (test scores and norm-compared interpretations) is commonly used . . . to determine fitness for duty as a police officer . . . ." (*Id.* at 5 (emphasis omitted)). "The choice by a municipality or other entity not to obtain this information (or detailed descriptions and interpretations from this information) from its appointed psychological examiners constitutes deliberate indifference to the potential importance of this information to both hiring and personnel development decisions." (*Id.* (emphasis omitted)).

with the other parts of the screening process.  As Dr. Tate testified, the psychological tests provide only a portion of the information used to evaluate an applicant.  The City also relies on the background check and the clinical interview.  Dr. Claiborn acknowledged that the MMPI-2 and the IPI are two of the most widely used tests for police selection.  (*Id.*).  He did not identify a basis to infer that the tests used were so deficient as to make the City's continued use of them evidence of deliberate indifference.

Finally, although Joseph's polygraph results included some "inconclusive" answers, this is insufficient to give rise to a factual dispute as to municipal liability.  The plaintiffs do not argue that a police department is required to polygraph test its applicants in the first place.  Nor is there evidence that the "inconclusive" answers were a basis to find that the City was deliberately indifferent to the risk that, if accepted as a police officer, Joseph would violate the constitutional right of women in Houston to be safe from rape.  The record lacks evidence that would tend to show a pattern of screening deficiencies that has led to accepting police-officer candidates who commit rape.  The record lacks evidence that would tend to show that Joseph's performance on the screening tests indicated to the City that the "plainly obvious consequence" of accepting Joseph as a police officer was that he would commit rape.  *Brown*, 520 U.S. at 411.

The case of *Hardeman v. Kerr County*, 244 F. App'x 593 (5th Cir. 2007) (per curiam), is instructive.  In that case, a jail guard allegedly raped an inmate, who filed suit under § 1983.  The evidence showed that the guard did not answer the question in his employment application asking whether he had ever been fired.  Nor did he sign the application to certify that the facts were true and correct.  Nor did the County follow up on whether he was eligible for rehire in his prior positions as a police officer for a school district and as a juvenile detention officer.  The guard was

fired from his school-district job for making improper advances toward a female student. *Id.* at 596.

The Fifth Circuit noted that the County "should have done a better job screening Marrero," but

upheld summary judgment for the County:

> There are no grounds to find that the alleged rape in question was a "plainly obvious
> consequence" of hiring him.  Even if the County had done a thorough job of
> investigating Marrero, there was absolutely no history of violence, sexual or
> otherwise, to be found.  While the grounds for his discharge from Harlandale ISD
> were troubling, especially in retrospect, it requires an enormous leap to connect
> "improper advances" towards female students to the sexual assault at issue here.
> Because Hardeman cannot establish that Marrero was highly likely to commit rape,
> there is no genuine issue of material fact, and summary judgment was proper as to
> the hiring of Marrero.

*Id.* (citations omitted).

Because the plaintiffs failed to raise a fact dispute that the City was deliberately indifferent

toward the plaintiffs' constitutional rights, the City is entitled to summary judgment.

## IV.    Conclusion

The City of Houston's motion for summary judgment and motion to strike are granted.  Final

judgment is entered by separate order.

SIGNED on July 9, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge